**HORIZON HOLDINGS, L.L.C. f/k/a Horizon Marine L.C.; Geoffrey Pepper; Cassandra O'Tool; and John O'Tool; Plaintiffs,**

v.

**GENMAR HOLDINGS, INC.; Genmar Industries, Inc.; and Genmar Manufacturing of Kansas, L.L.C., Defendants.**

No. 01–2193–JWL.

United States District Court,
D. Kansas.

Feb. 11, 2003.

Floyd R. Finch, Jr., Blackwell Sanders Peper Martin LLP, George A. Hanson, Stueve Helder Siegel LLP, Kansas City, MO, Nicole T. Bock, Blackwell Sanders Peper Martin LLP, Omaha, NE, Todd M. McGuire, Stueve Helder Siegal LLP, Kansas City, MO, for Plaintiffs.

Harlan D. Burkhead, Lathrop & Gage L.C., Kansas City, MO, Holly S.A. Eng, Judith Williams–Killackey, Thomas Tinkham, Dorsey & Whitney LLP, Minneapolis, MN, Rosalee M. McNamara, Tedrick A. Housh, III, Timothy K. McNamara, Lathrop & Gage L.C., Kansas City, MO, for Defendants.

### MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiffs filed suit against defendants asserting various claims arising out of defendants' acquisition of plaintiff Horizon Marine LC, an aluminum boat manufacturing company. Specifically, plaintiffs Horizon Holdings, LLC f/k/a Horizon Marine LC (hereinafter "Horizon") and Geoffrey Pepper claimed that defendants breached both the express terms of the purchase agreement entered into between the parties and the duty of good faith and fair dealing implied in the purchase agreement. Plaintiffs Horizon and Mr. Pepper further claimed that defendants made a variety of fraudulent misrepresentations to them for the purpose of inducing plaintiffs to enter into the purchase agreement. In addition, plaintiffs Cassandra O'Tool and John O'Tool alleged that defendants breached the employment agreements signed by them. Ms. O'Tool further alleged that defendants discriminated against her on the basis of her pregnancy when they denied her a raise and when they terminated her employment. Finally, Ms. O'Tool and Mr. Pepper claimed that defendants unlawfully terminated their employment in retaliation for Ms. O'Tool's and Mr. Pepper's complaints of pregnancy discrimination. For a more thorough understanding of the facts of this case, please see the court's order resolving defendants' motions for summary judgment, *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F.Supp.2d 1123 (D.Kan.2002).

In November 2002, plaintiffs' claims were tried to a jury and, at the conclusion of the trial, the jury returned a verdict in favor of plaintiffs Horizon and Mr. Pepper on their breach of contract claim in the amount of $2,500,000. The jury also found in favor of the O'Tools on their claims that defendants breached the O'Tools' employment contracts and awarded Ms. O'Tool the sum of $63,200 and Mr. O'Tool the sum of $20,313. The jury found in favor of defendants on all other claims.

This matter is presently before the court on three post-trial motions-plaintiffs' motion to alter or amend the judgment (doc. # 197); plaintiffs' motion for attorneys' fees, costs and expenses (doc. # 198); and defendants' renewed motion for judgment as a matter of law pursuant to Rule 50(b) or, in the alternative, motion for remittitur

and/or new trial pursuant to Rule 59 (doc. # 199). As set forth in more detail below, plaintiffs' motion to alter or amend the judgment is granted only to the extent that a typographical error in the judgment will be corrected and is otherwise denied; plaintiffs' motion for attorneys' fees, costs and expenses is granted in part and denied in part; and defendants' renewed motion for judgment as a matter of law, for remittitur and/or for a new trial is denied.

## I. Defendants' Renewed Motion for Judgment as a Matter of Law, for Remittitur and/or for New Trial

Defendants seek post-trial relief on all aspects of the jury's verdict that are favorable to plaintiffs. The primary thrust of defendants' post-trial motion concerns the jury's verdict of $2.5 million in favor of Horizon and Mr. Pepper on the breach of contract claim. According to defendants, this award constitutes a windfall unsupported by the facts or the law. Defendants urge that plaintiffs, as a matter of law, are not entitled to recover any damages in the form of lost earn-out. In the alternative, defendants contend that the award must be remitted or a new trial must be granted on lost earn-out damages. Defendants also seek judgment as a matter of law on the jury's liability finding on the breach of contract claim, asserting that plaintiffs failed to present legally sufficient evidence that defendants breached the express or implied terms of the purchase agreement. Similarly, defendants move for judgment as a matter of law on the O'Tools' claims for breach of their respective employment agreements or for a remittitur of those verdicts. Finally, defendants assert that they are entitled to a new trial because the court erroneously admitted parol evidence and erroneously instructed the jury on the duty of good faith and fair dealing.

### A. The Jury's Verdict in favor of Plaintiffs Horizon and Geoff Pepper on their Breach of Contract Claim

■ The court first addresses defendants' argument that they are entitled to judgment as a matter of law on the jury's liability finding with respect to Horizon and Mr. Pepper's breach of contract claim. Judgment as a matter of law under Rule 50(b) "should be cautiously and sparingly granted," *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir.2001), and is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, "points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir.2002). In determining whether judgment as a matter of law is proper, the court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *See Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir.2001).

■ In essence, the court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could properly return a verdict for the nonmoving party. *See Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219–20 (10th Cir.1999) (citing *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir.1996)). Conversely, the court must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law." *Deters v. Equifax Credit Information Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quoting *Harolds*, 82 F.3d at 1546–47).

■ In their papers, defendants assert that, as a matter of law, they did not breach the express terms of the purchase

agreement or the implied terms of the purchase agreement. The jury was instructed that they could find in favor of plaintiffs on plaintiffs' breach of contract claim if they found that plaintiffs had proved a breach of one or more express terms or a breach of the implied duty of good faith and fair dealing. *See* Jury Instruction 12. Because the court concludes that there was ample evidence presented at trial to support a finding that defendants breached the implied covenant of good faith and fair dealing, the court declines to address defendants' arguments concerning whether the evidence was sufficient to support a finding that defendants had breached any express terms of the purchase agreement.

■ According to defendants, plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law because it purports to "add wholly new terms to the contract" and "requires the court to rewrite or supply omitted provisions to the purchase agreement in contravention of Delaware law."[1] This is, of course, an accurate statement of Delaware law. *See, e.g., Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co.,* 708 A.2d 989, 992 (Del.1998) ("Delaware observes the well-established general principle that ... it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."). Nonetheless, principles of good faith and fair dealing permit a court to imply certain terms in an agreement so as to honor the parties' reasonable expectations when those obligations were omitted, in the literal sense, from the text of the written agreement but can be understood from the text of the agreement. *Id.* In determining whether to imply terms in

an agreement, the proper focus is on "what the parties likely would have done if they had considered the issue involved." *Id.*

Nothing in this court's instructions to the jury would have permitted the jury to "rewrite" the purchase agreement or to inject into that agreement wholly new terms. In fact, the jury was instructed, entirely consistent with Delaware law, that they should consider "whether it is clear from what was expressly agreed upon by the parties that the parties would have agreed to prohibit the conduct complained of as a breach of the agreement had they thought to negotiate with respect to that matter." *See* Jury Instruction 12. Defendants argue in their papers that Mr. Pepper did not demonstrate at trial that the parties would have agreed to prohibit the challenged conduct if they had thought to negotiate about such conduct. Of course, defendants also made this argument to the jury. The jury rejected the argument and there was more than sufficient evidence presented at trial to support that conclusion.

For example, the jury could have readily concluded that, in light of the express agreement that plaintiffs would have an opportunity to realize up to $5.2 million in earn-out consideration (defined in the agreement itself as part of the "purchase price"), that the parties would have agreed, had they thought about it, that defendants would not be permitted to undermine Mr. Pepper's authority as president of Genmar Kansas; to abandon the Horizon brand name entirely; to mandate production of Ranger and Crestliner brands at the Genmar Kansas facility to the detriment of the Horizon brand; or to reimburse Genmar Kansas at only "standard cost"[2] for the manufacture of Ranger

---

1. The parties do not dispute that Delaware law governs plaintiffs' claim that defendants breached the terms of the purchase agree-

ment, as that agreement contains an express choice-of-law provision.

2. The undisputed evidence at trial was that

and Crestliner boats thereby impairing realization of the earn-out. If the jury concluded that defendants had engaged in such conduct (and there was sufficient evidence to draw such a conclusion), then the jury was free to conclude that such conduct was inconsistent with the spirit of the agreement concerning the earn-out consideration and that such conduct constituted a breach of the implied covenant of good faith and fair dealing. In short, there is evidence in the record upon which a jury could properly return a verdict for Horizon and Mr. Pepper on their breach of contract claim. Judgment as a matter of law, then, is not appropriate.

■ Defendants also assert that they are entitled to judgment as a matter of law on Horizon and Mr. Pepper's breach of contract claim because plaintiffs failed to present evidence upon which a reasonable jury could have concluded that defendants acted in bad faith. In support of this argument, defendants point to a Delaware Supreme Court decision defining "bad faith" as "the conscious doing of a wrong because of a dishonest purpose or moral obliquity; it is different from the negative idea of negligent in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund. II, L.P.,* 624 A.2d 1199, 1209 n. 16 (Del.1993). According to defendants, the evidence concerning defendants' course of conduct demonstrates only that defendants were attempting to make a profit and that no evidence was presented that defendants were acting with any furtive design or ill will.

■ As an initial matter, the jury was instructed that a "violation of the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct." *See* Jury Instruction 12. Thus, the court's instruction certainly requires that defendants' conduct reflect some element of bad faith. While the jury was not required to find specifically that defendants acted with furtive design or ill will in order to find that defendants had breached the covenant of good faith and fair dealing, defendants have not directed the court to any cases suggesting that proof of a breach of the duty of good faith and fair dealing is inadequate in the absence of proof of some furtive design or ill will. Certainly, the *Desert Equities* case does not suggest such a conclusion. There, the court defined "bad faith" only for purposes of contrasting the nature of that claim with a fraud claim in explaining why it was rejecting the defendants' argument that a plaintiff must plead with particularity under Rule 9(b) a claim of bad faith. *See* 624 A.2d at 1208. The court, then, rejects defendants' suggestion that evidence of some furtive design or ill will was necessary for a finding of liability on plaintiffs' claim that defendants breached the covenant of good faith and fair dealing. *See True North Composites, LLC v. Trinity Indus., Inc.,* 191 F.Supp.2d 484, 517–18 (D.Del.2002) (rejecting argument that claimant must prove that the other party acted "with furtive design or ill will" in order to prove a breach of the covenant of good faith and fair dealing).

In any event, even assuming that plaintiffs were required to prove that defendants acted with furtive design or ill will

"standard cost" was the amount that it actually cost Genmar Kansas to build the boat in terms of labor, material and overhead. In other words, Genmar Kansas was not making any profit on Ranger or Crestliner boats and, in most instances, was actually losing money

on these boats because Genmar Kansas was not operating at maximum efficiency. Profits on these boats that were built on the production line in the Genmar Kansas facility were earned by Ranger and Crestliner when they in turn sold the boats to their dealer network.

in order to prove a breach of the covenant of good faith and fair dealing, copious evidence was presented at trial demonstrating that defendants acted with the requisite "dishonest purpose" or "furtive design." There was ample evidence, for example, that defendants had ulterior motives for acquiring Horizon Marine, including the desire to remove a potentially significant competitor from the market and the desire to obtain a facility in the "southern" market dedicated primarily to the production of Ranger boats. There was also substantial evidence demonstrating that defendants' course of conduct was intended to benefit defendants' bottom line to the financial detriment of Mr. Pepper.

In that regard, the jury could reasonably have concluded that defendants' efforts to undermine Mr. Pepper's authority as president of Genmar Kansas and their decisions to abandon the Horizon brand name entirely, to mandate the production of Ranger and Crestliner brands at the Genmar Kansas facility and to reimburse Genmar Kansas at only "standard cost" for the manufacture of Ranger and Crestliner boats were all designed to either force Mr. Pepper to quit his employment (thereby extinguishing Mr. Pepper's right to collect any earn-out) or prevent Mr. Pepper from achieving the profit margins necessary to realize his earn-out (because the formula pursuant to which the earn-out was calculated was weighted heavily in favor of the production of Horizon boats). While defendants urge that such a characterization of the evidence simply makes no sense because defendants themselves made no money on the Horizon Marine acquisition (an argument that defendants presented at length to the jury), the evidence was sufficient to support the conclusion that defendants believed (but were ultimately incorrect) that they could still turn a profit through the production of Ranger and Crestliner boats at Genmar Kansas while simultaneously preventing Mr. Pepper from realizing any earn-out by stifling the production of Horizon boats and reimbursing Genmar Kansas only at standard cost for the production of other boats. Simply put, ample evidence was presented from which the jury could reasonably conclude that defendants' conduct, taken as a whole, was in "bad faith," regardless of how that phrase is defined.

In sum, the evidence presented at trial was more than adequate for the jury to conclude that defendants breached the implied covenant of good faith and fair dealing. Defendants' motion on this issue is denied.

### B. The Jury's Award of $2.5 Million for Lost Earn-Out Consideration

Defendants contend that they are entitled to judgment as a matter of law on Horizon and Mr. Pepper's claim for damages for two separate but related reasons. First, defendants assert that plaintiffs presented no evidence whatsoever for the jury to ascertain what position plaintiffs would have been in if the purchase agreement had been properly performed. Second, defendants assert that Delaware law precludes any recovery because Genmar Kansas was a new business with no profit history and no evidence was presented from which the jury could conclude that Genmar Kansas was reasonably certain to realize the gross profit margins necessary to achieve any earn-out under the agreement. In the alternative, defendants seek an order remitting the award to nominal damages of one dollar or a new trial on the issue of damages.

#### 1. Judgment as a Matter of Law

■ The jury was instructed that if they found that defendants had breached the purchase agreement and that plaintiffs sustained damages as a result of that

breach, then Horizon and Mr. Pepper were entitled to compensation "in an amount that [would] place them in the same position they would have been in if the purchase agreement had been properly performed." *See* Jury Instruction 13. According to defendants, plaintiffs made no effort to explain to the jury how, assuming defendants had performed their contractual obligations in good faith, Genmar Kansas would have ever met the requisite gross profit margins or generated the gross revenues necessary to entitle them to substantial earn-out payments. Stated another way, defendants urge that there was simply no evidence presented at trial that Genmar Kansas would have been profitable absent defendants' breach of the purchase agreement.

The evidence presented at trial, however, was more than sufficient to permit the jury to conclude that Genmar Kansas would have been profitable absent defendants' breach. Mr. Pepper, for example, testified on the second day of his direct examination that, in his mind, the requisite 13 percent gross profit margin was reasonable and obtainable based on his prior experience with other industry boat companies. According to Mr. Pepper, he had worked for other companies where the gross profit margins ranged from 15 percent to 30 percent, so the 13 percent figure seemed "low" to him. Mr. Pepper further testified that during the time that he was responsible for directing Lowe's manufacturing operations,[3] Lowe achieved gross profit percentages in the range of 30 percent. Mr. Pepper cautioned, however, that he needed a certain level of autonomy with respect to the management of Genmar Kansas to ensure that Genmar Kansas would realize the profits and revenues necessary for Mr. Pepper to obtain the earn-out. Specifically, Mr. Pepper testified on the first day of his direct examination that he sought (and received) assurances from Mr. Oppegaard and Mr. Cloutier that they would "allow [him] to do what is necessary in managing the company to obtain that earn-out." According to Mr. Pepper, Mr. Oppegaard further assured him that he would be in control of Genmar Kansas' operations and that he would be able to make the "operation decisions necessary" to obtain the earn-out.

The evidence presented at trial was also sufficient from which the jury could conclude that Horizon Marine, just prior to defendants' acquisition, was about to "break into the black" and turn a profit. Mr. Pepper, for example, testified on the first day of his direct examination that Horizon Marine was enjoying significant progress in late 1997 and the first six months of 1998. Mr. Pepper fully expected Horizon Marine to start making a profit in 1998. Indeed, the opinions and perspectives of other people associated with the acquisition lent additional credence to Mr. Pepper's beliefs. Mr. Pepper testified on direct examination, for example, that Bill Ek, a consultant for defendants who visited the Horizon Marine facility in November 1997, was "amazed" at "how far [Horizon Marine] had come in such a short period of time." Mr. Oppegaard testified on cross-examination that Mr. Ek had advised him that Mr. Pepper was "the best product development person in the industry." Similarly, the jury heard testimony on the first day of Mr. Pepper's direct examination that Mr. Oppegaard was impressed and excited about what Mr. Pepper had been able to accomplish with Horizon Marine in a short period of time. In fact, Mr. Oppegaard, after meeting Mr. Pepper and visiting Horizon Marine for the first time, sent an internal memoran-

---

3. Lowe is another aluminum boat manufacturing company. Mr. Pepper worked for Lowe for nearly ten years; ultimately Lowe was purchased by defendants.

dum to his executive team in which he described Mr. Pepper and the Horizon product as "a major competitor if left alone to grow." Mr. Oppegaard also testified on cross-examination that he anticipated that Horizon Marine would grow very fast.

From this evidence, a reasonable jury could infer that if defendants had allowed Mr. Pepper to direct the daily operations of Genmar Kansas, then Mr. Pepper would have been able to achieve the requisite gross profit margins to realize the earn-out. *See Harrington v. Hollingsworth,* 1992 WL 91165, at *4 (Del.Super.Ct. Apr. 15, 1992) (in breach of contract case, lost income damages not speculative where commercial fisherman testified that had the defendant constructed his larger commercial fishing boat on time, he would have been able to catch more sea bass and double his annual income; fisherman's testimony was sufficient to establish damages with reasonable probability where his projections were based on bass fishing industry, an industry with which plaintiff was familiar and in which he had participated for 20 years).

■ Moreover, defendants attempted to demonstrate at trial-through both argument and the examination of witnesses-that plaintiffs' claim for damages based on the earn-out was unreasonable because it was uncertain whether the company would have been able to meet the requisite profit margins and revenues. Defendants' efforts in that regard apparently had some impact-the jury awarded only half of the total earn-out consideration. Presumably, then, the jury concluded that plaintiffs had not proved loss of the total earn-out amount with reasonable certainty. Finally, any doubt concerning the amount of damages sustained by plaintiffs is resolved against defendants. As the breaching party, defendants "should not be permitted to reap advantage from [their] own wrong by insisting on proof which by reason of

[their] breach is unobtainable." *See* E. Allan Farnsworth, *Contracts* § 12.15 at 922 (2d ed.1990); *accord Restatement (Second) of Contracts* § 352 cmt. a (Any doubts in the proof of damages are resolved against the party in breach because "[a] party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred.").

In a related argument, defendants contend that they are entitled to judgment as a matter of law on plaintiffs' claim for damages because, under Delaware law, "a new business with no profit history cannot obtain lost profit damages." *See* Defs. Br. at 7. On its face, then, defendants' argument is premised on the idea that plaintiffs' damages for lost earn-out consideration is the equivalent of an award for damages based on lost profits. Given the nature of the earn-out consideration at issue in this case, however, it is simply not appropriate to subject plaintiffs' claim for damages to a traditional lost profits analysis.

To be sure, Genmar Kansas' profitability was an important component of the earn-out formula. However, unlike those cases in which one party seeks to recover lost profits when the issue of whether that party could reasonably expect such profits is in dispute, the ·parties here agreed at the outset of their relationship that it was reasonable for Mr. Pepper to expect an additional $5.2 million in earn-out consideration pursuant to a formula developed by defendants. Indeed, the parties agreed that the earn-out consideration was part of the total purchase price for the acquisition-an agreement that is reflected in Article 2 of the contract, which states that the "Cash Consideration and. the Earn–Out Consideration described in Section 2.2 below are referred to in this Agreement in

the aggregate as the 'Purchase Price.' " *See* Trial Ex. 227a § 2.1. As Mr. Pepper explained on the second day of his direct examination, defendants initially proposed the earn-out consideration as "more of an incentive-type thing" separate and apart from the purchase price. However, after multiple discussions during which Mr. Pepper, Mr. Oppegaard and Mr. Cloutier all agreed that the earn-out was obtainable and that Mr. Pepper would be given the requisite autonomy to obtain the earn-out, defendants ultimately agreed to include the earn-out as part of the purchase price.

While both parties agreed at trial that the earn-out was not a "guarantee," ample evidence was presented that all parties believed there to be "reasonable probability" that Mr. Pepper would realize the full amount of the earn-out. Indeed, on his direct examination, Mr. Pepper testified that both Mr. Cloutier and Mr. Oppegaard assured him that the earn-out was obtainable. On his cross-examination, Mr. Pepper testified that he advised his investors in writing that "the management of Horizon believes there is a reasonable probability that . . . the earn-out consideration will be achieved." Similarly, Mr. Cloutier testified on direct examination that he he believed at the time of the transaction that Mr. Pepper had a "very realistic" opportunity to achieve the earn-out. Moreover, on cross-examination, Mr. Cloutier testified that he believed that the earn-out portion of the purchase agreement was achievable based in part on defendants' own internal projections.

In their papers, defendants now characterize their assurances and beliefs that the earn-out was obtainable as mere "pre-contractual guesswork" and contend that to permit plaintiffs to recover damages based on such guesswork without considering Genmar Kansas' "actual performance" is to provide plaintiffs with an "unwarranted windfall." This argument, however, ig-

nores the significance of the jury's implicit finding-that Genmar Kansas' actual performance would have been different (indeed, it would have been profitable) had defendants performed their obligations under the purchase agreement consistent with plaintiffs' reasonable expectations. In other words, the jury apparently found that defendants' conduct, including undermining Mr. Pepper's managerial authority and requiring increased production of multiple models of Ranger boats, had the effect of rendering Mr. Pepper unable to perform as he had planned, unable to operate Genmar Kansas appropriately and ultimately unable to succeed in achieving any earn-out consideration. For these reasons, defendants' reliance on the actual performance of Genmar Kansas as a basis for judgment as a matter of law is misplaced.

In sum, the court rejects defendants' attempt to analyze plaintiffs' claim for damages as one for lost profits. The jury's award of $2.5 million is not speculative and is supported by evidence that Genmar Kansas would have been profitable and that the earn-out would have been obtainable if defendants had performed in good faith their obligations under the purchase agreement.

### 2. Remittitur

 As an alternative to their argument that they are entitled to judgment as a matter of law on plaintiffs' claim for damages in the form of lost earn-out, defendants maintain that this court should enter a remittitur reducing the $2.5 million verdict to nominal damages of one dollar in light of the "utterly speculative nature" of the lost earn-out damages. Of course, the court has already concluded that the jury's award of $2.5 million was not speculative, so the motion for remittitur is denied. In any event, under Delaware law, the court may order a remittitur only if the verdict

"is so grossly out of proportion as to shock the Court's conscience." *See Gillenardo v. Connor Broadcasting Delaware Co.*, 2002 WL 991110 at *10 (Del.Super.Ct. Apr.30, 2002) (citing *Mills v. Telenczak*, 345 A.2d 424, 426 (Del.1975)); *see also Century 21 Real Estate Corp. v. Meraj Int'l Investment Corp.*, 315 F.3d 1271, 1281 (10th Cir.2003) (in assessing measure of damages awarded pursuant to contract containing choice of law provision, district court must follow chosen state's law-absent any argument that choice of law provision is unenforceable-including that state's law concerning remittitur).

Again, the jury had before it sufficient evidence to conclude that plaintiffs would have realized a significant portion of the earn-out consideration had defendants performed in good faith their obligations under the contract. The $2.5 million verdict represents exactly half of the entire earn-out portion of the purchase agreement and exactly half of what the plaintiffs sought to recover on their breach of contract claim. The award is not excessive, it is not unreasonable, it does not shock the court's conscience and, thus, it will not be remitted. *See id.* at 1282–83 (affirming district court's refusal to remit $700,000 verdict on breach of contract claim, despite concerns about reliability of testimony concerning lost profits and "unrealistic" projections; district court reviewed award under "shock the conscience" standard).

### 3. New Trial

█ Defendants' final arguments with respect to the jury's verdict on plaintiffs' breach of contract claim is that they are entitled to a new trial because the verdict is against the weight of the evidence and the result of passion and prejudice. Delaware law permits a district court to set aside a verdict and order a new trial only if "the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result."

*See Gannett Co. v. Re*, 496 A.2d 553, 558 (Del.1985). For the reasons set forth above in connection with defendants' motion for judgment as a matter of law, the court concludes that evidence presented at trial was sufficient for the jury to have reached the result that it did. Similarly, for the reasons explained above, the court cannot conclude that the verdict is so clearly excessive as to indicate that it was the result of passion or prejudice. *See Yankanwich v. Wharton*, 460 A.2d 1326, 1332 (Del.1983) ("A verdict will not be disturbed as excessive unless it is so clearly so as to indicate that it was the result of passion, prejudice, partiality, or corruption; or that it was manifestly the result of disregard of the evidence or applicable rules of law."). The jury's verdict of $2.5 million on plaintiffs' breach of contract claim will stand.

### C. The Jury's Verdicts in favor of Cassandra O'Tool and John O'Tool

The jury also found in favor of Cassandra O'Tool and John O'Tool on their claims that defendants breached the O'Tools' employment contracts. The jury awarded Ms. O'Tool the sum of $63,200 and Mr. O'Tool the sum of $20,313. Defendants assert that they are entitled to judgment as a matter of law on the O'Tools' claims for breach of their employment contracts or, in the alternative, that they are entitled to a remittitur reducing the damages awarded to the O'Tools. For the reasons explained below, defendants' motion is denied.

### 1. Judgment as a Matter of Law

█ At trial, Cassandra and John O'Tool argued that defendants breached the express terms of their respective employment agreements. Specifically, the O'Tools maintained that, pursuant to the express language of their employment agreements, defendants could not discharge Mr. or Ms. O'Tool prior to the end

of an initial three-year employment period except in four narrow circumstances and that they were not discharged for any of those four reasons. In support of their argument, the O'Tools highlighted for the jury section 3 and section 7 of their employment agreements:

3. *Term of Employment.* This Agreement shall have a term of three (3) years, subject to earlier termination pursuant to the provisions of Section 7 hereof.

* * * * * *

7. *Termination and Severance.*

(a) This Agreement may be terminated prior to the end of the three (3) year term by Genmar Kansas for (i) cause, (ii) lack of adequate job performance as determined by Genmar Kansas' President and the President of Genmar Holdings, (iii) death of Employee, or (iv) disability of Employee.

(b) In the event Genmar Kansas terminates Employee's employment for any reason other than termination for cause, death or disability Employee shall be entitled to six (6) months of severance pay at the base salary Employee is earning on the date of such termination.

Defendants attempted to convince the jury, and now the court, that the O'Tools were terminated for "lack of adequate job performance" consistent with section 7 of their employment contracts. The jury clearly rejected defendants' argument and, in finding that defendants breached the O'Tools' employment contracts, concluded that the O'Tools were not terminated for inadequate job performance or any other reason set forth in section 7. Indeed, ample evidence was presented at trial to support the jury's conclusion. In that regard, the jury could have concluded

(and presumably did conclude) that the O'Tools were terminated not because of any performance issues but because of their familial ties with Geoff Pepper, the key individual with whom defendants were attempting to sever their relationship. In other words, the jury could have easily concluded from the evidence presented at trial that defendants terminated Mr. and Mrs. O'Tool because defendants believed it would be awkward to retain the O'Tools after terminating Geoff Pepper.

Another possibility, equally supported by the evidence, is that the jury concluded that the O'Tools were terminated for inadequate job performance but that the assessment of their job performance was not, as required by section 7, "determined by Genmar Kansas' President and the President of Genmar Holdings." Specifically, the jury could have concluded that Mr. Pepper was still serving as the president of Genmar Kansas during the relevant time period and that Mr. Pepper had not determined that his daughter and son-in-law were performing inadequately. Moreover, the jury could have concluded from the evidence presented at trial that Mr. Oppegaard, the president of Genmar Holdings, had simply not made an assessment of the O'Tools' job performance. In fact, Mr. Oppegaard testified at trial that he had never discussed with Mr. Pepper the adequacy of the O'Tools' job performance and that he did not make the decision to terminate the O'Tools.

Defendants also reiterate their argument (made at the summary judgment stage, to the court at the close of plaintiffs' case and to the jury throughout the trial) that Section 12 of the O'Tools' employment agreements eviscerates any notion that the O'Tools were guaranteed employment for a three-year term.[4] Section 12 of the

---

**4.** In their papers, defendants also assert that section 4 of the employment agreements sup-

ports their argument that the O'Tools were not guaranteed a specific term of employ-

agreement, entitled "Miscellaneous," contains the following sentence: "This Agreement shall not give Employee any right to be employed for any specific time or otherwise limit Genmar Kansas' right to terminate Employee's employment at any time with or without cause." As the court noted in its summary judgment order, however, any ambiguity created when sections 3 and 7 are read together with section 12 was for the jury to resolve and defendants certainly are not entitled to judgment as a matter of law on the O'Tools' breach of contract claims based on the language of section 12. *See Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F.Supp.2d 1123, 1146 (D.Kan.2002). Moreover, the jury could have concluded that section 12, read literally, gives only Genmar Kansas the right to terminate an employee for any reason whatsoever and that, in contrast, Genmar Holdings and Genmar Industries are bound by the language of sections 3 and 7.

In sum, the court certainly cannot conclude as a matter of law that the O'Tools were terminated for lack of adequate job performance consistent with section 7 of their employment agreements or that the O'Tools were not guaranteed any specific term of employment. The record contains more than sufficient evidence upon which the jury could properly return a verdict for the O'Tools on their breach of contract claims.

### 2. Remittitur

■ In the alternative, defendants urge that the damages awarded by the jury to the O'Tools are excessive and against the weight of the evidence and, as

a result, they ask the court to enter an order of remittitur reducing the awards. The court begins with defendants' arguments concerning the jury's award of $63,200 to Ms. O'Tool. According to defendants, Ms. O'Tool's lost wages for the relevant time period were only $52,000 and thus, the jury must have awarded Ms. O'Tool more than $11,000 in lost MIP earnings (a bonus pursuant to defendants' Management Incentive Program). Defendants urge that the $52,000 in lost wages must be reduced because the jury failed to deduct from this amount any wages that Ms. O'Tool could have earned if she had made reasonable efforts to obtain other employment.

■ Of course, the burden was on defendants to prove that Ms. O'Tool failed to mitigate her damages. *See Leavenworth Plaza Assocs., L.P. v. L.A.G. Enterprises*, 28 Kan.App.2d 269, 272, 16 P.3d 314 (2000) (citing *Kelty v. Best Cabs, Inc.*, 206 Kan. 654, 659, 481 P.2d 980 (1971); *Rockey v. Bacon*, 205 Kan. 578, 583, 470 P.2d 804 (1970)).[5] Defendants spent very little time on this issue at trial. They presented no evidence regarding any specific jobs that might have been available to Ms. O'Tool and, in contrast, plaintiffs presented evidence reflecting that Ms. O'Tool did, in fact, attempt to find alternative employment but was unsuccessful. Ultimately, defendants simply failed to carry their burden on the mitigation issue.

Defendants further contend that the jury's calculation of Ms. O'Tool's lost MIP earnings was inaccurate. Consistent with the evidence presented by plaintiffs at trial, the jury apparently awarded Ms. O'Tool approximately $11,000 in lost MIP earn-

ment. Defendants, however, have not mentioned section 4 at any time prior to filing their renewed motion and certainly did not highlight this section for the jury.

5. The parties do not dispute that Kansas law governs the O'Tools' breach of contract claims as the O'Tools' employment contracts contained a provision identifying Kansas law as the parties' choice of law.

ings, representing 20 percent of Ms. O'Tool's salary. Significantly, defendants do not contest that Ms. O'Tool's employment agreement provided that her MIP compensation would be 20 percent of her salary assuming that both Genmar Holdings and Genmar Kansas met their operating profit goals. Moreover, defendants do not contest that 20 percent of Ms. O'Tool's salary over the relevant 15–month period at issue (the time of her termination through the time when Ms. O'Tool's employment contract would have expired) would be roughly $11,000.[6] Rather, defendants urge that the jury incorrectly assumed that both Genmar Holdings and Genmar Kansas would have met their operating profit goals during the relevant time frame-an assumption that defendants characterize as "clearly erroneous" in light of the fact that Genmar Kansas never reached the operating profits necessary to generate MIP payments.

■■■ Similarly, defendants contend that the jury improperly calculated Mr. O'Tool's lost MIP earnings when it awarded him $20,313. In that regard, the jury's verdict represents only lost MIP earnings as it was undisputed that Mr. O'Tool earned more money in his subsequent job than he would have earned if he had stayed at Genmar Kansas. Defendants do not dispute that Mr. O'Tool's employment contract provided that his MIP compensation would be 25 percent of his salary (assuming that both Genmar Holdings and Genmar Kansas met their operating profit goals). Defendants also do not dispute that the jury's verdict of $20,313 repre-

sents almost to the penny 25 percent of Mr. O'Tool's annual salary of $65,000 over the course of 15 months.[7] Again, defendants maintain only that the jury incorrectly assumed (or wildly speculated) that both Genmar Holdings and Genmar Kansas would have met their operating profit goals during the relevant time frame and that, in fact, Genmar Kansas never met the requisite profit goals.

Of course, defendants had the opportunity to make this argument to the jury and did, in fact, make this argument to the jury. The jury, as it was entitled to do, rejected this argument and plainly adopted plaintiffs' theory, thoroughly developed at trial, that Genmar Kansas would have reached its operating profit goals but for defendants' breach of their obligations under the purchase agreement, including their duty of good faith and fair dealing. In short, the jury's award of $63,200 to Ms. O'Tool and $20,313 to Mr. O'Tool does not shock the conscience of this court and, thus, no remittitur will be issued. *See Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 486, 15 P.3d 338 (2000) (court has the power to issue a remittitur where a verdict is so manifestly excessive that it shocks the conscience of the court); *see also Century 21 Real Estate Corp. v. Meraj Int'l Investment Corp.*, 315 F.3d 1271, 1281 (10th Cir.2003) (in assessing measure of damages awarded pursuant to contract containing choice of law provision, district court must follow chosen state's law-absent any argument that choice of law provision is unenforceable-including that state's law concerning remittitur).

---

**6.** In their papers, defendants assert that 20 percent of Ms. O'Tool's salary is only $8320. That figure, however, is based on Ms. O'Tool's annual salary of $41,600 instead of the total salary that Ms. O'Tool would have earned over the relevant 15–month period.

**7.** When Mr. O'Tool's annual salary is translated into a monthly salary, and that monthly

salary is multiplied by 15 months (measured from the time of Mr. O'Tool's discharge through the time when Mr. O'Tool's employment contract would have expired), his total lost salary is $81,249.90 (65,000/12 = $5,416.66 per month × 15). Twenty-five percent of $81,249.90 is $20,312.47.

### D. Remaining Arguments in Support of New Trial

Finally, defendants assert that they are entitled to a new trial pursuant to Federal Rule of Civil Procedure 59(a) in light of two "substantial errors of law" committed by the court. Specifically, defendants contend that the court erred in admitting parol evidence of the parties' negotiations prior to the execution of the purchase agreement and that the court erred in its instruction to the jury regarding the appropriate standard for determining whether defendants breached the implied covenant of good faith and fair dealing. The court addresses each of these arguments in turn and, as explained below, rejects both arguments.

#### 1. Admission of Parol Evidence

■ In their motion, defendants initially argue that the court erred when it admitted, over defendants' objection, parol evidence of the parties' negotiations to support plaintiffs' claim that they were fraudulently induced into executing the purchase agreement. Curiously, defendant concedes (in the same paragraph) that the law permits such evidence to prove fraudulent inducement. What defendants are really arguing is that parol evidence is inadmissible to prove bad faith in a breach of contract claim and that the jury should not have been permitted to consider evidence of the parties' negotiations (and, more specifically, oral assurances made to plaintiffs by defendants prior to the execution of the agreement) in connection with plaintiffs' claim that defendants breached the implied duty of good faith and fair dealing.[8]

■ While defendants objected at trial to the admission of parol evidence concerning the parties' negotiations, they did not,

once the court ruled that such evidence was clearly admissible with respect to plaintiffs' fraud claim, request a limiting instruction or even raise the issue of whether such evidence was admissible with respect to plaintiffs' breach of contract claim. In fact, defendants concede, as they must, that they failed to request a limiting instruction. Defendants, however, urge that parol evidence is a rule of substantive law that is not waived by the failure to object to its admission. *See Carey v. Shellburne, Inc.,* 224 A.2d 400, 402 (Del.1966). While this is certainly true, there is nonetheless an evidentiary objection-relevance under Federal Rules of Evidence 401 and 402–that defendants should have made (and did not) if they desired to preclude the jury from considering such evidence with respect to plaintiffs' breach of contract claim. Because defendants failed to raise a timely objection to the admission of such evidence on that basis and request a limiting instruction, the court reviews the admission of the evidence under the "plain error" standard. *See* Fed.R.Evid. 103(d).

■ The court readily concludes that the admission of evidence concerning the parties' negotiations prior to executing the purchase agreement was not plain error. In fact, the point largely is moot because the court, even if defendants had brought the issue to the court's attention at trial, would have permitted the jury to consider such evidence in connection with plaintiffs' claim that defendants breached the implied covenant of good faith and fair dealing. In other words, the court would have overruled any objection that defendants might have made in this regard.

---

**8.** This argument presupposes that the jury considered such evidence in connection with plaintiffs' breach of contract claim. Defen-

dants, of course, have no way of knowing that the jury did, in fact, consider such evidence in its assessment of the breach of contract claim.

■ The parol evidence rule requires the court to exclude "extraneous evidence that varies or contradicts the terms of a unified written instrument." *True North Composites, LLC v. Trinity Indus., Inc.,* 191 F.Supp.2d 484, 514 (D.Del.2002) (citation omitted). Because defendants have not shown (much less argued) that the evidence presented at trial concerning the parties' negotiations varied or contradicted the terms of the purchase agreement, such evidence simply does not require invocation of the parol evidence rule. Moreover, because the purchase agreement was silent with respect to the majority of the issues discussed by the parties prior to the execution of the agreement (*e.g.,* the number of Ranger boats that Genmar Kansas would be expected to produce or whether Genmar Kansas would be expected to produce any sister-brand boats at all), evidence concerning the parties' pre-acquisition negotiations is entirely appropriate to provide context for plaintiffs' claim that defendants breached their duty of good faith and fair dealing. *See id.* at 514–15 (denying motion for new trial based on court's alleged error in admitting parol evidence of transaction underlying written agreement because evidence provided context to good-faith-and-fair-dealing claims and testimony did not vary or contradict the terms of the agreement).

In other words, evidence concerning what the parties discussed prior to executing the agreement, to the extent such evidence, as here, does not contradict the agreement, is entirely relevant to whether defendants breached the covenant of good faith and fair dealing because the parties' reasonable expectations at the time of the contract formation determine the reasonableness of the challenged conduct. *See id.* at 516 (evidence concerning course of dealings between the parties prior to execution of agreement was relevant to claim that party breached the covenant of good faith and fair dealing because such evidence illuminated the parties' expectations of each other at the time of contract formation).

To conclude, then, defendants have not shown that the parol evidence rule required exclusion, at least for purposes of plaintiffs' breach of contract claim, of evidence concerning the parties' negotiations prior to the execution of the purchase agreement. The court rejects defendants' contention that it erred by allowing the jury to consider such evidence.

### 2. The Good Faith and Fair Dealing Instruction

■ Defendants' final argument in support of their motion for a new trial is that the court erred in its instruction to the jury concerning the duty of good faith and fair dealing. In its instructions, the court explained the duty, under Delaware law, as follows:

[T]he law imposes a duty of good faith and fair dealing in every contract. This duty is a contract term implied by courts to prevent one party from unfairly taking advantage of the other party. This duty includes a requirement that a party avoid hindering or preventing the other party's performance. The implied covenant of good faith and fair dealing emphasizes faithfulness to an agreed common purpose and consistency for the justified expectations of the other party. The parties' reasonable expectations at the time of the contract formation determines the reasonableness of the challenged conduct. A violation of the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct.

In determining whether defendants breached the implied covenant of good faith and fair dealing, you may consider whether it is clear from what was expressly agreed upon by the parties that

the parties would have agreed to prohibit the conduct complained of as a breach of the agreement had they thought to negotiate with respect to that matter. *See* Jury Instruction 12. The court's instruction, in large part, was based on an instruction given by another federal court applying Delaware law concerning the duty of good faith and fair dealing, *True North Composites, LLC v. Trinity Indus., Inc.*, 191 F.Supp.2d 484 (D.Del.2002). In *True North*, the court, faced with a motion for a new trial based an alleged errors in the good faith and fair dealing instruction, reviewed its instruction and found it to be "consonant with Delaware law." *Id.* at 517–18. Specifically, the court noted that its instruction "tracks the language of § 205(a) of the Restatement (Second) of Contracts (1979), which has been used by Delaware courts to explain the duty of good faith." *Id.* at 518.[9] In short, the court readily concluded that its instruction on the duty of good faith and fair dealing was not in error. *Id.*

Defendants urge, as they did at the instruction conference, that any proper instruction on the duty of good faith and fair dealing under Delaware law must require a finding that the conduct at issue involved "fraud, deceit or misrepresentation." Defendants' proposed instruction, for example, contained the following sentence that the court expressly rejected: "To prove defendants breached the implied duty of good faith and fair dealing in the Purchase Agreement, plaintiffs must demonstrate that defendants engaged in conduct of fraud, deceit or misrepresentation." *See* Def. Proposed Instruction 5. This proffered language is derived from *Corporate Property Associates 6 v. Hallwood Group Inc.*, 792 A.2d 993 (Del.Ch.2002), a trial court decision from the Court of Chancery

in Delaware. In that case, a commercial dispute, the Vice Chancellor stated that a claimant seeking to prove a breach of the implied covenant of good faith and fair dealing "must also demonstrate that the conduct at issue involved 'an aspect of fraud, deceit or misrepresentation.'" *Id.* at 1003. At the instruction conference, defendants relied solely on the *Corporate Property* case to support their proffered instruction. Indeed, defendants did not direct the court to any other Delaware case-much less a Delaware Supreme Court case or a federal case interpreting Delaware law-in which a court required a finding of fraud, deceit or misrepresentation to support a breach of the covenant of good faith and fair dealing in the context of a commercial transaction.

As the court explained at the conference, the trial court in *Corporate Property* cites only to *Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 101 (Del.1992) in support of the "fraud, deceit or misrepresentation" language. The *Merrill* case involved an employment-at-will contract and the court held that when the conduct of an employer in the employment-at-will context rises to the level of fraud, deceit or misrepresentation, then the employer will have violated the implied covenant of good faith and fair dealing. *Id.* Interestingly, the *Merrill* court, in turn, relies on two cases from two other state courts in support of its conclusion that an element of fraud, deceit or misrepresentation must be present before an employer violates the covenant of good faith and fair dealing. *Id.* Those cases, *Magnan v. Anaconda Indus., Inc.*, 37 Conn.Supp. 38, 429 A.2d 492 (1980) and *A. John Cohen Ins. v. Middlesex Ins. Co.*, 8 Mass.App.Ct. 178, 392 N.E.2d 862 (1979),

---

**9.** While the court in *True North* referenced § 205(a) of the Restatement (Second), that Restatement does not contain a § 205(a); the court intended to reference comment a of § 205.

both arise in the employment-at-will context.

In the limited and unique context of employment-at-will, requiring an employee to prove that his or her employer's conduct amounted to fraud in order to show a breach of the duty of good faith and fair dealing is entirely consistent with the notion of an at-will employment relationship. For in the absence of a showing of fraud, the covenant of good faith and fair dealing could not operate in the employment-at-will context without wholly defeating the benefit for which the parties bargained-the employer's ability to discharge the employee and the employee's ability to quit his or her employment for good reason, bad reason or no reason at all. Stated another way, parties to an at-will employment relationship are generally not subjected to any good faith standard.[10] On the other hand, in the context of a commercial transaction like the one presented here, the implied covenant of good faith and fair dealing-as it is typically applied (*i.e.*, without a requirement of fraud)-does not conflict with the benefit for which parties to a commercial transaction generally bargain. For these reasons, the court reiterates its belief that the trial court in *Corporate Property* incorrectly incorporated into the commercial context the "fraud, deceit or misrepresentation" language from the employment-at-will context of *Merrill.*[11] Defendants, for the first time, now also cite to a Delaware Supreme Court case that they assert rejects the distinction that this court has drawn between the commercial context and employment-at-will context. Specifically, defendants rely on *Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co.*, 708 A.2d 989 (Del.1998) and contend that in *Cincinnati Bell* the Delaware Supreme Court "made clear that the same standard applied by the Delaware court in *Merrill* should also be applied in the commercial contract context." Defendants' characterization of the *Cincinnati Bell* case is simply inaccurate; in fact, that case supports this court's conclusion that any requirement that a party prove fraudulent conduct to demonstrate a violation of the duty of good faith and fair dealing is limited to the employment-at-will context.

In *Cincinnati Bell*, the Delaware Supreme Court reviewed a decision by the Court of Chancery dismissing, pursuant to Rule 12(b)(6), a good faith and fair dealing claim arising in the context of a limited partnership agreement. *Id.* at 990. Specifically, the Delaware Supreme Court affirmed the lower court's conclusion that the implied covenant of good faith and fair dealing could not provide a basis for implying additional noncompete obligations in a limited partnership agreement where the agreement's noncompete clause was unambiguous. *Id.* at 993–94. In so holding, the *Cincinnati Bell* court emphasized that "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise." *Id.* at 992.

---

10. For this reason, many states, including Kansas, have held that there is simply no implied covenant of good faith and fair dealing in the employment-at-will context. *See, e.g., St. Catherine Hosp. of Garden City v. Rodriguez*, 25 Kan.App.2d 763, 765, 971 P.2d 754 (1998) (Kansas does not recognize any good faith obligation in the employment-at-will context) (citing cases).

11. It may be that the court in *Corporate Property* was simply using the fraud language as a short-hand for the concept of bad faith. The point, however, is that the court fails to explain why it is utilizing that language and fails to provide any insight into the significance, if any, of that language, such as whether a party bringing a good faith and fair dealing claim would be held to proving the elements of fraud (*e.g.*, false representation, scienter and reliance) in order to prevail.

Tracing the development of the implied covenant under Delaware law, the court in *Cincinnati Bell* noted that the *Merrill* case was the first case in which the court "first recognized the limited application of the covenant to inducement representations in at-will employment contracts." *Id.* The *Cincinnati Bell* court further noted that in *Merrill,* the court "was careful to heed the legal right of employers to pursue a certain amount of self-interest in the creation of contractual relationships" and "held that, to plead properly a claim for breach of an implied covenant of good faith and fair dealing in the inducement of employment, a plaintiff must allege 'an aspect of fraud, deceit or misrepresentation.'" *Id.* at 992–93 (quoting *Merrill,* 606 A.2d at 101–02). The court in the *Cincinnati Bell* case then stated, "[t]his Court should be no less cautious or exacting when asked to imply contractual obligations from the written text of a limited partnership agreement." *Id.* at 993. Defendants argue that this single sentence clearly illustrates an intent by the Delaware Supreme Court to incorporate the fraud standard of the employment-at-will context into the commercial transaction context. A full reading of *Cincinnati Bell,* however, indicates that the court was simply stressing the narrow scope of the implied covenant and that application of the covenant is a "cautious enterprise." *Id.* at 992–93. There is no indication in *Cincinnati Bell* that the court utilized the fraud standard of *Merrill* in resolving the appeal. In short, *Cincinnati Bell* in no way suggests that the jury in this case should have been instructed that plaintiffs were required to prove that defendants acted fraudulently in order to prove a breach of the implied covenant and, more importantly, the court believes that the Delaware Supreme Court, if faced with the issue, would refuse to adopt such a requirement.

Moreover, defendants' construction of Delaware law on good faith and fair deal-ing is illogical as it would render a good faith and fair dealing claim entirely duplicative of a fraud claim. In fact, defendants essentially contend that plaintiffs' good faith and fair dealing claim should be converted into one of fraud. Under defendants' theory, then, plaintiffs could not prevail on their good faith and fair dealing claim without also prevailing on their fraud claim. Any distinction, then, between the two claims would be lost. Such a result would be untenable, as the Delaware Supreme Court obviously recognizes a distinction between the two claims. *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.,* 624 A.2d 1199, 1207–08 (Del.1993) (distinguishing claim of fraud from allegations of bad faith).

Finally, defendants contend that the court's instruction on the duty of good faith and fair dealing was erroneous because it failed to inform the jury that plaintiffs were required to show affirmative acts of bad faith on the part of defendants. The court's instruction advised the jury that a violation of the implied covenant of good faith and fair dealing "implicitly indicates bad faith conduct." While defendants may have preferred different language concerning bad faith, they have not identified how the court's instruction departs from or incompletely portrays Delaware law. Moreover, defendants have not demonstrated why plaintiffs' proof of a breach of the duty of good faith and fair dealing is inadequate without further proof of affirmative acts of bad faith conduct. The court, then, rejects defendants' argument that the instruction was erroneous. *See True North,* 191 F.Supp.2d at 517–18 (rejecting argument that instruction was erroneous because it failed to advise that the claimant must prove that the other party acted in bad faith where movant failed to show how the court's instruction was inconsistent with Delaware law).

## II. Plaintiffs' Motion to Alter or Amend the Judgment

The judgment entered on November 21, 2002 states that plaintiffs Horizon and Mr. Pepper shall recover on their breach of contract claim "the sum of $2,500,000.00, with interest thereon at the rate of 1.46 percent per annum as provided by law." Plaintiffs move to alter or amend the judgment to reflect the parties' contractually agreed interest rate of 2 percent per month.[12] In that regard, the relevant section of the purchase agreement executed by the parties states as follows:

> In the event that the Non–Defaulting Party is entitled to receive an amount of money by reason of the Defaulting Party's default hereunder, then, in addition to such amount of money, the Defaulting Party shall promptly pay to the Non–Defaulting Party a sum equal to interest on such amount of money accruing at the rate of 2% per month (but if such rate is not permitted under the laws of the State of Delaware, then at the highest rate which is permitted to be paid under the laws of the State of Delaware) during the period between the date such payment should have been made hereunder and the date of the actual payment thereof.

*See* Purchase Agreement, Section 13.2(b) (Trial Exhibit 227a). Defendants oppose plaintiffs' motion for three reasons. According to defendants, the contractual rate of interest specified in the purchase agreement is preempted by the standard rate contained in 28 U.S.C. § 1961; plaintiffs have waived their right to have the judgment accrue interest at the parties' contractually agreed rate; and the contractually agreed rate is not permitted under Delaware law. As set forth below, the court concludes that parties are free to contract for a rate other than that specified in 28 U.S.C. § 1961 and, thus, the federal statute does not supersede the parties' agreement. Nonetheless, because the court concludes that plaintiffs have waived their right to assert the rate set forth in the purchase agreement by not preserving their claim of entitlement to such rate in the pretrial order and by failing to raise the issue until after the entry of judgment, the court denies plaintiffs' motion to alter or amend the judgment to the extent plaintiffs seek to enforce the rate established in the purchase agreement.

### A. Whether Section 1961 Supersedes the Contractually Agreed Rate

Defendants contend that 28 U.S.C. § 1961, the federal statute governing post-judgment interest, must govern the award of post-judgment interest in this case despite the parties' contractual agreement for a different rate. Section 1961 states, in relevant part, that "[i]nterest shall be allowed on any money judgment in a civil case recovered in district court" and that [s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of the fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." 28 U.S.C. § 1961(a).

In support of their argument, defendants direct the court to *Wilmington Trust Co. v. Aerovias de Mexico, S.A. de C.V.*, 893 F.Supp. 215, 220 (S.D.N.Y.1995),

---

12. In their motion to alter or amend, plaintiffs also point out that the judgment entered on November 21, 2002 contains a typographical error in that the judgment states that the verdict was returned by the jury on November 12, 2002. The jury, however, returned its verdict on November 21, 2002. The judgment will be corrected, and plaintiffs' motion will be granted, in this respect.

where the court calculated post-judgment interest at the section 1961 rate despite a contractual agreement providing for a higher rate. In that case, the district court simply stated that the language of section 1961(a) is mandatory and must govern the interest rate on any judgment debt:

> The language of [section 1961(a)] is mandatory: once a claim is reduced to judgment, the original claim is extinguished, and a new claim, called a judgment debt, arises. Section 1961(a) governs the interest rate on this judgment debt. *Carte Blanche (Singapore) v. Carte Blanche (Int.),* 888 F.2d 260 (2d Cir.1989), citing *Kotsopoulos v. Asturia Shipping Co.,* 467 F.2d 91 (2d Cir.1972).

*Id.* at 220–21. The *Wilmington* case, however, is not entirely helpful for purposes of this court's analysis of whether parties can contract for a rate of interest different from the rate set forth in section 1961(a). In that regard, the district court in *Wilmington* did not expressly address whether the parties could contract around the federal statute. Rather, the court seemed to assume that the parties would not be permitted to do so under Second Circuit precedent. However, *Carte Blanche* and *Kotsopoulos,* the Second Circuit cases upon which the *Wilmington* court relies, do not stand for the proposition that parties cannot contract for a different rate of interest. In *Kotsopoulos,* a maritime case, the issue before the Second Circuit was only whether state law or federal law would determine the appropriate rate of post-judgment interest in admiralty and maritime cases. *See* 467 F.2d at 94–95. Similarly, the Second Circuit in *Carte Blanche* did not address whether parties to a contract could provide for a rate different than the standard rate set forth in section 1961(a). There, the Circuit held that an arbitrator could not impose a post-judgment interest rate different than the rate established in section 1961(a). *See* 888

F.2d at 268–69 (district court judgment affirming an arbitration award is governed by section 1961(a) rather than rate set forth in arbitration award).

Plaintiffs, on the other hand, urge that nearly every Circuit Court of Appeals to have addressed this issue has concluded that the parties can agree to an interest rate other than the standard one contained in 28 U.S.C. § 1961. For example, the Seventh Circuit in *Central States, Southeast & Southwest Areas Pension Fund v. Bomar National, Inc.,* 253 F.3d 1011 (7th Cir.2001), affirmed a district court's award of post-judgment interest pursuant to the rate agreed upon in a pension trust agreement rather than the standard rate contained in section 1961(a). In so doing, the Seventh Circuit stated that "[i]t is well established that parties can agree to an interest rate other than the standard one contained in 28 U.S.C. § 1961." *Id.* at 1020. In support of its statement, the Seventh Circuit cites to the Fifth Circuit's decision in *Hymel v. UNC, Inc.,* 994 F.2d 260, 265 (5th Cir.1993).

In *Hymel,* the Fifth Circuit "noted" that the district court was correct when it awarded post-judgment interest at a rate of 9 percent per annum pursuant to express language contained in a promissory note executed by the parties. *Id.* at 265–66. The Circuit summarily rejected the argument that section 1961 applies in every case without exception and, in doing so, cited to another Fifth Circuit case, *In re Lift & Equipment Service, Inc.,* 816 F.2d 1013 (5th Cir.1987). *See id.* In *In re Lift,* a case arising out of the bankruptcy court, the parties disputed whether the creditor was entitled to post-judgment interest under Louisiana law or under section 1961(a), 816 F.2d at 1018. The Fifth Circuit, however, rejected both arguments and, embracing a view that none of the parties had espoused, applied the interest

rate set forth in the written assignment of accounts receivable. *Id.* In so doing, the Circuit stated, "While 28 U.S.C. § 1961 provides a standard rate of post-judgment interest, the parties are free to stipulate a different rate, consistent with state usury and other applicable laws." *Id.*

While the Fifth Circuit in *In re Lift* offered no explanation for its conclusion, it cited to a Ninth Circuit decision, *Investment Service Co. v. Allied Equities Corp.*, 519 F.2d 508 (9th Cir.1975). In that case, the district court judge applied the interest rate agreed upon by the parties in a promissory note. *Id.* at 511. The guarantor of the loan argued that the assignee of the note was only entitled to the legal rate of interest under Oregon state law. *See id.* The Ninth Circuit rejected the argument:

> It is true that the contractual duty here is discharged by merger once the judgment is entered on the note. *Restatement of Contracts* § 444. However, upon entry of the judgment the legal rate of interest applicable should apply unless the parties have agreed in the note that some other rate of interest shall apply. *Corbin on Contracts* § 1045 (1962).

*Id.* The court's reliance on Corbin, however, is somewhat puzzling in that Corbin does not purport to draw any conclusion about the effect of a judgment on the parties' contractual agreement to a different rate and it does not address a contractual agreement for post-judgment interest; rather, the section cited by the Ninth Circuit deals only with the payment of interest as "agreed compensation" for a breach of the contract. *See* Arthur Linton, *Corbin on Contracts* § 1045 (Interim ed.2002) (expressly stating that section 1045 addresses neither a contract right to interest nor statutory rights thereto, but only interest recoverable as compensatory damages for a breach of contract). In any event, the court ultimately applied Ore-

gon's legal-rate-of-interest statute, which specifically provides that parties to a contract can agree to a higher rate of interest provided that such rate does not exceed the maximum rate allowed by law. *See id.*

The court concedes at the outset that the cases relied upon by plaintiffs, to the extent those cases purport to stand for a well-recognized rule that parties are free to contract for an interest rate other than the rate established in section 1961(a), are problematic in certain respects. In large part, the cases offer very little analysis as to why parties would be able to contract around the seemingly mandatory language of section 1961(a). Moreover, in several of the cases, the precise issue was not one that the court had to decide and, thus, any conclusions about the issue would be mere dicta. Nonetheless, it is clear that the Seventh, Fifth and Ninth Circuits consider it beyond dispute that parties are free to contract for whatever post-judgment interest rate they choose. In addition, the Fourth Circuit, albeit in an unpublished decision, expressly adopted the Fifth Circuit's *Hymel* decision in affirming a district court's award of post-judgment interest at a rate set forth in a stock redemption agreement as opposed to the rate set forth in section 1961(a). *See Carolina Pizza Huts, Inc. v. Woodward*, 67 F.3d 294, 1995 WL 572902, at *3 (4th Cir.1995). Moreover, at least one district court has declined to award post-judgment interest at the section 1961(a) rate where the parties stipulated to the entry of a judgment which provided for interest at a higher rate. *See In re Connaught Properties, Inc.*, 176 B.R. 678, 684–85 (Bankr.D.Conn.1995).

In the end, the court is called upon to resolve a difficult legal issue on which the Tenth Circuit has not been called to opine—an issue that is rendered that much more difficult in light of the dearth of on-point

analysis by other courts. After carefully weighing both sides of the issue, the court ultimately believes that the Tenth Circuit would likely concur with those Circuits that have held that parties should be and are able to contract for a rate other than the rate set forth in section 1961(a). While section 1961 without a doubt uses mandatory language, the court concludes that Congress intended it to be mandatory in the sense that a district court or other third party (*e.g.*, an arbitrator) has no discretion to award a different rate of interest or to decline to award post-judgment interest. *See, e.g., Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1104 (7th Cir.1990) (section 1961(a) allows the judge no discretion to deny the interest authorized by that section); *Carte Blanche*, 888 F.2d at 269 (the language of section 1961 is mandatory and its terms do not permit the exercise of judicial discretion in its application). The court, however, can discern no sound reason why Congress would have intended that parties themselves could not agree to a different rate. Thus, the court rejects defendants' contention that section 1961(a) supersedes the rate agreed upon by the parties in the purchase agreement.

## B. Whether Plaintiffs Waived the Right to Assert the Contractually Agreed Rate

Defendants also oppose plaintiffs' motion to alter or amend on the grounds that plaintiffs waived the right to assert the 2% per month rate by failing to include that rate in the pretrial order. Plaintiffs concede that they did not articulate in the pretrial order their claim of entitlement to a higher rate of post-judgment interest. Nonetheless, plaintiffs contend that no such claim needed to be asserted in the pretrial order. As explained below, the court disagrees with plaintiffs on this point.

In their papers, plaintiffs rely to a large extent on the legal principles that an award of post-judgment interest is mandatory, *see Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc.*, 103 F.3d 80, 81 (10th Cir.1996), and, as such, must be made regardless of what was demanded in the complaint or stated in the pretrial order. *See Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1104 (7th Cir.1990); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2664 at 186–87 (1998). However, the issue is not whether plaintiffs were required to request post-judgment interest in the pretrial order to receive an award of post-judgment interest. The law is clear (and defendants do not dispute) that plaintiffs are entitled to post-judgment interest, at least at the rate established in 28 U.S.C. § 1961(a), despite their failure to request such an award in the pretrial order. The issue as this court sees it is whether plaintiffs are entitled to an award of post-judgment interest at the higher rate of interest specified in the purchase agreement when no such request was made in the pretrial order.

It is axiomatic that a Rule 59(e) motion cannot be used to raise a new issue that could have been raised prior to judgment. *See Steele v. Young*, 11 F.3d 1518, 1520 n. 1 (10th Cir.1993); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2810.1 (2d ed.1995). In other words, Rule 59(e) is "aimed at *re* consideration, not initial consideration" and, thus, a party may not rely on Rule 59(e) to raise an argument which could, and should, have been made before judgment issued. *United States ex rel. Noyes v. Kimberly Constr., Inc.*, 43 Fed.Appx. 283, 286–87 (10th Cir.2002) (emphasis in original). Despite plaintiffs' insistence that they did not need to raise the issue prior to judgment,

it is beyond dispute that plaintiffs could have raised the issue prior to judgment. Unlike an award of postjudgment interest pursuant to 28 U.S.C. § 1961, the award sought by plaintiffs here was not necessarily a "given." In that regard, while defendants assert only legal arguments in opposition to plaintiffs' claim of entitlement to the higher rate of interest, it is possible that defendants could have sought to raise factual arguments in opposition to the claim. For example, defendants could have asserted that section 13.2(b) was altered by plaintiffs after the contract was signed.[13] Had defendants so asserted, then they would have been entitled to have the jury resolve that dispute. Because a court is not permitted to give relief under Rule 59(e) "if this would defeat a party's right to jury trial on an issue," *see* Wright, Miller & Kane, *supra,* § 2810.1, then the fact that one in the place of defendants might have had fact-based defenses available renders plaintiffs' request for award of postjudgment interest pursuant to the purchase agreement the type of request that cannot be raised for the first time pursuant to Rule 59(e).

According to plaintiffs, defendants were nonetheless on notice that plaintiffs would assert a claim of entitlement to an award of postjudgment interest at the higher rate because defendants executed the purchase agreement and are charged with knowledge of the contents of that agreement. The court finds this argument disingenuous as it is clear that plaintiffs themselves did not remember (or perhaps even recognize) that the purchase agreement provided for a higher rate of interest until very late in the litigation process. Indeed, section 13.2(b) provides not only

for postjudgment interest, but prejudgment interest-a remedy that plaintiffs failed to request at any time during the course of the litigation (and a remedy that plaintiffs acknowledge they cannot now seek). Plaintiffs' failure in that regard demonstrates to the court that they were not aware of or did not remember the contents of section 13.2(b). Moreover, while section 13.2(a) provides for a prevailing party to recover reasonable attorneys fees, plaintiffs did not assert a claim for fees in the pretrial order. This also demonstrates to the court the likelihood that plaintiffs had not considered the contents of section 13.2 in connection with this case at any time prior to entry of the pretrial order. Only after defendants asserted in the pretrial order a right to recover fees did plaintiffs scour the purchase agreement looking for the source of defendants' claim. At that point, after the entry of the pretrial order, plaintiffs moved to amend the pretrial order to assert a claim for fees. The court granted that motion because defendants, who had asserted a claim for the recovery of fees pursuant to the purchase agreement, were not prejudiced by the addition of that claim in that they clearly had knowledge of that portion of the contract and they had not demonstrated that plaintiffs' right to recover fees would affect the trial of the case in any way.

The court concludes that defendants were entitled to notice from plaintiffs-prior to trial and, hopefully, at least by the date of entry of the final pretrial order-that plaintiffs intended to seek postjudgment interest at the contractual rate. Such notice would have enabled defendants to as-

---

**13.** No one, of course, is suggesting that plaintiffs did so; the court is simply posing a hypothetical for illustrative purposes to demonstrate that there might have been fact-based defenses available to defendants had the issue been raised by plaintiffs. Thus, be-

cause plaintiffs were not necessarily automatically entitled to the higher rate, the court rejects plaintiffs' contention that Federal Rule of Civil Procedure 54(c) requires an award of post-judgment interest at the higher rate irrespective of the contents of the pretrial order.

certain whether they had any good faith factual arguments to raise in the face of section 13.2(b)-factual arguments that could have been presented to the jury. Moreover, such notice would have permitted defendants to assess fully the risk of bringing this case to trial. More specifically, defendants would have been able to ascertain the total potential exposure that they might face if the jury, as they did, returned a verdict in favor of plaintiffs. Indeed, the interest rate set forth in the contract–2 percent per month–would expose defendants to an additional $600,000 per year in indebtedness to plaintiffs on a verdict of $2.5 million, assuming the jury's verdict is upheld on appeal. In short, the court believes that defendants were entitled to actual notice that plaintiffs' recovery might encompass this significant amount.

In sum, plaintiffs' motion to alter or amend the judgment is denied to the extent plaintiffs seek an award of post-judgment interest pursuant to the interest rate set forth in the parties' purchase agreement.

### C. Whether Delaware Law Prohibits Application of the Contractually Agreed Rate

Because the court denies plaintiffs' motion on the grounds that plaintiffs waived their right to assert the higher interest rate found in the purchase agreement, the court need not address defendants' argument that the higher rate is not permitted under Delaware law. Nonetheless, in the interest of judicial economy in the event the parties' appeal this court's decision to the Tenth Circuit, the court notes, without elaborating in full detail, that it would conclude that the higher rate established in the contract is permissible under Delaware law.

The Delaware law governing post-judgment interest is codified at section 2301 of Title 6 of the Delaware Code and states, in relevant part, as follows:

> Any lender may charge and collect from a borrower interest at any rate agreed upon in writing not in excess of 5% over the Federal Reserve discount rate including any surcharge thereon, and judgments entered after May 13, 1980, shall bear interest at the rate in the contract sued upon. Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due; provided, that where the time from which interest is due predates April 18, 1980, the legal rate shall remain as it was at such time.

*Id.* § 2301(a). The court agrees with defendants that section 2301(a) clearly provides that no interest rate can exceed 5% over the federal discount rate and rejects plaintiffs' argument that because the judgment in this case was entered after May 13, 1980, section 2301(a) permits interest to accrue at a contractually agreed rate.

However, as plaintiffs highlight in their papers, section 2301(c) expressly provides that there is "no limitation on the rate of interest which may be legally charged for the loan or use of money, where the amount of money loaned or used exceeds $100,000, and where repayment thereof is not secured by a mortgage against the principal residence of any borrower." While defendants urge that this provision does not apply because it is limited to the context of a unsecured loan between a lender and a borrower, section 2301(a) on its face would also appear to apply only to lenders and borrowers. Thus, if subsection (a) applies to the purchase agreement (as defendants urge that it does), then subsection (c) would have to apply as well. In any event, defendants are precluded under Delaware law from challenging the

contractual rate as usurious. *See* Del. Code. tit. 6 § 2306 ("No corporation ... or limited liability company ... shall interpose the defense of usury in any action.").

For these reasons, the court would conclude that the rate of interest agreed upon by the parties in the purchase agreement is not prohibited by Delaware law.

## III. Plaintiffs' Motion for Attorneys' Fees, Costs and Expenses

█ The purchase agreement executed by the parties provides that the prevailing party shall be entitled to recover from the defaulting party all costs and expenses, including reasonable attorneys' fees, incurred in connection with enforcing the terms of the purchase agreement. *See* Purchase Agreement, Section 13.2(a) (Trial Exhibit 227a). Pursuant to this provision of the contract, and having prevailed on their breach of contract claim, plaintiffs Horizon and Mr. Pepper seek attorneys' fees and expenses totaling $846,740.35.[14] As set forth below, with the exception of a few minor adjustments, the court grants plaintiffs' motion.[15]

█ The parties have stipulated to the reasonableness of all billing rates and, thus, the court need not address that issue. To the extent defendants do oppose plain-

tiffs' fee request, that opposition is both exceedingly narrow and easily resolved. Defendants assert that plaintiffs' request is simply too exorbitant because of the "limited success" achieved by plaintiffs at trial. To be clear, defendants have not articulated any objections to any specific portion of the fee request or plaintiffs' billing records and they do not contest any specific time entries. Instead, defendants assert only a general objection to the fee request as unreasonable. Indeed, in the face of a request for nearly $850,000 in fees and expenses, defendants have submitted a brief that is less than 9 pages in length.

█ Defendants suggest in their papers that they are relieved of the burden of objecting to specific portions of plaintiffs' fee request because, according to defendants, plaintiffs have failed to meet their burden of showing that the request is reasonable. The court disagrees. To meet their burden of proving the number of hours reasonably spent on the litigation, plaintiffs "must submit meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks." *United Phosphorus, Ltd. v.*

14. Plaintiffs' fee request covers the time period ending December 31, 2002. To the extent plaintiffs intend to recover fees, costs and expenses incurred in January 2003 in connection with responding to defendants' motion for judgment as a matter of law and filing their initial fee application, plaintiffs must file a motion for a supplemental award of fees, as those figures are not presently before the court. To the extent plaintiffs intend to seek fees in connection with defending an appeal filed by defendants, plaintiffs must direct such a request to the Tenth Circuit. *See, e.g., San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 477 (10th Cir.1988).

15. Because plaintiffs' fee request stems from a contractual fee provision, plaintiffs' request

is subject to far less scrutiny than a request made pursuant to a fee-shifting statute and the court does not possess the same degree of equitable discretion to deny such fees as it has when applying a statute providing for a discretionary award. *See United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.*, 834 F.2d 1533, 1547–50 (10th Cir.1987) (remanding claim for attorneys' fees made pursuant to contractual fee provision where district court reduced the fee and, in doing so, applied the wrong standard and scrutinized the fee request too closely). In such cases, fees are "routinely awarded" unless the trial court determines that an award consistent with the request would be inequitable or unreasonable. *Id.* at 1548.

*Midland Fumigant, Inc.,* 205 F.3d 1219, 1233 (10th Cir.2000) (citing *Case v. Unified Sch. Dist. No. 233,* 157 F.3d 1243, 1249–50 (10th Cir.1998)). The district court, then, may reduce the number of hours when the time records provided to the court are inadequate. *Id.* at 1233–34. The court has reviewed the billing records submitted by plaintiffs and those records are more than adequate to meet plaintiffs' burden.

 Defendants also invite the court to dissect plaintiffs' billing records in an effort to determine or "approximate" those fees that are attributable to the breach of contract claim and those fees that are attributable to the unsuccessful claims. The court, however, is not obligated to comb the record to ferret out deficiencies in plaintiffs' submission. It is defendants' obligation to direct the court to such deficiencies if they believe such deficiencies exist. *See Public Serv. Co. of Colorado v. Continental Casualty Co.,* 26 F.3d 1508, 1521 (10th Cir.1994) ("We do not feel that the trial judge was obligated to comb the evidence before him-consisting of voluminous attorney billing records-to ferret out gaps or inconsistencies in the evidence presented on the fees."); *see also United States ex rel. C.J.C., Inc. v. Western States Mechanical Contractors, Inc.,* 834 F.2d 1533, 1549 (10th Cir.1987) ("[T]he trial court is not responsible for independently calculating a 'reasonable' fee."). Nonetheless, the court has reviewed the billing records and, in large part, concludes that plaintiffs' fee request is a reasonable one. The court will, however, deduct from plaintiffs' request fees of $67.50 for work performed by attorney Normal Siegel on April 15, 2002 and fees of $585.00 for work performed by attorney Amy Baumann on August 14, 2002. It is apparent from plaintiffs' papers that they intended to deduct these fees from their request (and to request fees for attorney time only to the extent work was done by the two primary lawyers involved in the case-

George Hanson and Todd McGuire) but, presumably by oversight, neglected to do so. Similarly, the court will deduct fees of $3195.00 incurred during July 2002 in connection with plaintiffs' motion to compel discovery. Again, plaintiffs' papers indicate that they intended to deduct these fees from their request, having already recovered this sum from defendants by virtue of this court's July 25, 2002 order, but the billing records indicate that this deduction was not, in fact, made.

To reiterate, then, aside from these minor deductions, the court has reviewed the billing records and, in the absence of any specific objection to plaintiffs' request and in the absence of any evidence that the hours claimed by plaintiffs are unreasonable, concludes that plaintiffs' fee request is a reasonable one. *See Robinson v. City of Edmond,* 160 F.3d 1275, 1279, 1285–86 (10th Cir.1998) (plaintiffs requested $186,000 in fees and defendants generally objected to this request as unreasonable but specifically articulated objections to only $43,000 of the request, leaving $142,000 in requested attorney's fees "not separately contested;" district court abused its discretion in reducing fee award in part because the end result was a fee award that was below the "unrebutted," "unchallenged," and "uncontested" amount of the fee request); *Sheets v. Salt Lake County,* 45 F.3d 1383 (10th Cir.1995) (affirming trial court's fee award in part because defendants failed to proffer any evidence that the hours claimed were unreasonable and, instead, simply made unsubstantiated allegations that the fees were duplicative and exorbitant in nature).

Defendants' general objection to plaintiffs' request is that the request is simply unreasonable in light of plaintiffs' "limited success"-plaintiffs prevailed only on their "relatively simple" contract claim. In the context of this litigation, however, a ver-

dict of $2.5 million is a substantial victory for plaintiffs and there was nothing "simple" about the contract claim. Rather, the case presented complex commercial issues and plaintiffs' counsel successfully developed those issues at trial. Indeed, Mr. Pepper and Horizon's breach of contract claim-the claim on which plaintiffs ultimately succeeded-encompassed a claim that defendants had breached the implied covenant of good faith and fair dealing, a claim that is often difficult for judges and lawyers to comprehend let alone lay persons on a jury. To prove plaintiffs' claim at trial, plaintiffs' counsel could not rely on an express term of the contract and could not point to one specific act that constituted defendants' breach. Instead, counsel was required to convey to the jury that defendants' entire course of conduct (conduct that spanned over 18 months) breached an "implied" duty to act in "good faith." Despite the sheer volume of evidence needed to describe and place in context defendants' course of conduct, coupled with the need to fit that evidence into amorphous concepts like "good faith" and "implied duty," plaintiffs' counsel achieved a multimillion dollar verdict for his clients. For these reasons, the court readily concludes (and defendants cannot seriously dispute) that plaintiffs obtained excellent results at trial. *See Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1120 (10th Cir.2001) (proper focus is on the overall relief obtained). No blanket reduction is warranted and plaintiffs' counsel is deserving of a fully compensatory fee. *See Hensley v. Eckerhart*, 461 U.S. 424, 433–35, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

In a related vein, defendants contend that plaintiffs are only permitted to recover those reasonable fees and expenses incurred in connection with the pursuit of their contract claim. Defendants contend that plaintiffs are improperly attempting to recover fees and expenses associated with the numerous claims on which plaintiffs did not prevail at trial and that the time and labor required to present evidence to the jury that defendants breached the purchase agreement was "only a small part of that actually expended by plaintiffs' counsel." The court rejects this argument, too. As an initial matter, plaintiffs' papers demonstrate that plaintiffs' counsel have already excluded from their request those hours associated with discrete research and other work related to plaintiffs' statutory discrimination claims, including hours spent working with plaintiffs' expert witness concerning plaintiffs' potential damages under Title VII. *See Robinson*, 160 F.3d at 1281 (prevailing party must make a good faith effort to exclude from request those hours that are excessive, redundant or otherwise unnecessary).

In any event, in light of the fact that most, if not all, of the unsuccessful claims were intertwined with the successful breach of contract claim through a common core of fact or related legal theories, any reduction of fees would be inappropriate. *See id.* at 1283 (reversing district court's reduction of fee award on the grounds that plaintiffs achieved only partial success where all unsuccessful claims were intertwined with the successful claims). The law is clear that when a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the court or jury did not adopt each contention raised. *See Hampton*, 247 F.3d at 1120 (citing *Jane L. v. Bangerter*, 61 F.3d 1505, 1512 (10th Cir.1995)) (affirming district court's refusal to reduce fee award based on alleged limited success; all of the claims were similar and stemmed from the same set of facts). Indeed, the Supreme Court has cautioned that a court should exclude an unsuccessful claim from a fee award only if that claim is "distinct in

all respects" from the successful claim. *See Hensley*, 461 U.S. at 440, 103 S.Ct. 1933.

Utilizing this standard (a standard that defendants do not even reference in their papers), the court simply cannot conclude that any of plaintiffs' unsuccessful claims are unrelated to the pursuit of the ultimate result achieved. Indeed, any attempt to divide the hours expended in this case on a claim-by-claim basis would be difficult and unjust. Nearly all of the claims pursued by plaintiffs-particularly plaintiffs' fraud and breach of contract claims-centered on the same core of facts. Any investigation or development of the fraud claim would necessarily have encompassed plaintiffs' breach of contract claim (and vice versa) as both claims required careful scrutiny of the parties' pre-contractual negotiations and the parties' conduct throughout the course of the contractual relationship. Thus, it is not surprising to this court that the billing records of plaintiffs' counsel, in large part, do not distinguish between claims. *See id.* at 435, 103 S.Ct. 1933 ("Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis."). Moreover, the Tenth Circuit has emphasized the importance of allowing litigants the "breathing room" necessary to raise alternative legal grounds that seek the same result and, thus, focusing on the actual result of the trial rather than dividing attorneys' fees by the number of successful claims. *See Robinson*, 160 F.3d at 1283.

For the foregoing reasons, the court rejects defendants' contention that a blanket reduction of fees is warranted and, with the exception of the minor adjustments noted above, grants plaintiffs' motion for fees and costs and expenses.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' motion to alter or amend the judgment (doc. # 197)

is **granted in part and denied in part.** Specifically, the motion is granted to the extent that a typographical error in the judgment shall be corrected and is otherwise denied; plaintiffs' motion for attorneys' fees, costs and expenses (doc. # 198) is **granted in part and denied in part and the court awards plaintiffs fees, costs and expenses in the amount of $842,-892.85;** and defendants' renewed motion for judgment as a matter of law pursuant to Rule 50(b) or, in the alternative, motion for remittitur and/or new trial pursuant to Rule 59 (doc. # 199) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** the clerk of the court shall amend the judgment to reflect this court's award of $842,892.85 in attorneys' fees, costs and expenses. The amended judgment should also be corrected to reflect that the jury returned a verdict on November 21, 2002 as opposed to November 12, 2002.

IT IS SO ORDERED.