816 F.2d 1013
 Bankr. L. Rep. P 71,818
In re LIFT & EQUIPMENT SERVICE, INC., Debtor.
ITT DIVERSIFIED CREDIT CORP., Plaintiff-Appellee, Cross-Appellant,
v.
LIFT & EQUIPMENT SERVICE, INC., Defendant-Appellant, Cross-Appellee.
 No. 86-3086.
 United States Court of Appeals,
Fifth Circuit.
 April 30, 1987.
Rehearing Denied June 18, 1987.*
 
 Emile L. Turner, Jr., Turner, Young & Hebbler, New Orleans, La., for defendant-appellant, cross-appellee.
 Robert A. Mathis, Newman, Drolla, Mathis, Brady & Wakefield, Metairie, La., for plaintiff-appellee, cross-appellant.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before GEE, POLITZ, and WILLIAMS, Circuit Judges.
 POLITZ, Circuit Judge:
 
 
 1
 The trustee of the bankruptcy estate of Lift & Equipment Service, Inc. appeals the judgment of the district court affirming the bankruptcy court's recognition of a creditor's security interest in certain accounts receivable. Finding no error in the rulings on the merits, and after modifying the award of interest, we affirm.
 
 Background
 
 2
 On November 6, 1979, ITT Diversified Credit Corporation opened a line of credit in favor of Lift & Equipment Service, Inc. The line of credit was secured by a collateral chattel mortgage and an assignment of accounts receivable, the latter made pursuant to La.R.S. 9:3101 et seq., the Louisiana Assignment of Accounts Receivable Act. In accordance with the Act, a statement of assignment was inscribed in the public records of Orleans Parish, Louisiana. In 1979 the law provided that such an inscription was valid for two years, subject to reinscription for additional two-year periods.
 
 
 3
 As the end of the initial two-year period neared, ITT sent documents of reinscription to the appropriate Orleans Parish authorities, accompanied by a check for $4.00. The receiving clerk, believing the reinscription fee to be $7.00, returned the documents to ITT with a request for the larger sum.[1] ITT promptly complied and the statement of assignment was reinscribed, however there was a short lapse between the end of the first period of inscription and the reinscription.
 
 
 4
 Both the bankruptcy court and the district court held that the lapse between inscription and reinscription did not affect the basic validity of the assignment as between ITT and Lift. The district court also made certain rulings concerning which funds were subject to the assignments, and awarded ITT 12% interest.
 
 Analysis
 I. Jurisdiction
 
 5
 At the outset, it is necessary that we examine appellate jurisdiction. Initially the parties did not address the issue. Pursuant to our continuing duty to consider the existence of jurisdiction, sua sponte if necessary, Giannakos v. M/V Bravo Trader, 762 F.2d 1295 (5th Cir.1985), we requested additional briefing. The parties now submit that the decision of the district court is an appealable order. Because appellate jurisdiction may not be conferred by consent of the parties, we must examine further.
 
 
 6
 Jurisdiction of appeals in bankruptcy matters is provided by 28 U.S.C. Sec. 158(d):
 
 
 7
 The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered ... [by district courts or bankruptcy appellate panels provided by the same section].[2]
 
 
 8
 We analyzed this provision at length in In re Delta Services Industries, 782 F.2d 1267, 1269 (5th Cir.1986), recognizing that "courts properly view finality more flexibly under Sec. 158(d) (and its predecessor, Sec. 1293(b)) than under [28 U.S.C.] Sec. 1291" (which provides for appeals from final judgments in ordinary civil proceedings). As a panel of this court recently noted, "in the bankruptcy context ... a case need not be appealed as a 'single judicial unit' at the termination of the proceeding as a whole." In re County Management, Inc., 788 F.2d 311, 313 (5th Cir.1986).
 
 
 9
 The reason for the more liberal application of finality rules in the bankruptcy setting is obvious. Under the umbrella of a single bankruptcy proceeding there may be any number of separable claims which, outside of bankruptcy, would form separate lawsuits. Only after each of the creditors' claims is defined may the bankruptcy court entertain a final disposition of the estate. For that reason, the courts have consistently held that " 'final' does not mean the same thing in bankruptcy as in other federal cases. A proceeding to establish a claim against a bankrupt estate is final for purposes of appeal when it is over and done with, even though the bankruptcy goes on." In re Fox, 762 F.2d 54, 55 (7th Cir.1985); In re County Management, Inc., 788 F.2d 311 (5th Cir.1986).
 
 
 10
 While finality in bankruptcy is a more flexible concept than in ordinary civil proceedings, it is not an empty vessel into which the courts may pour whatever meaning they favor. The general rule prevails, as it does in civil actions, that "a final order 'must generally be "one which ends the litigation * * * and leaves nothing for the court to do but execute the judgment." ' " Id. at 313 (citations omitted). In bankruptcy cases involving remands, the order which includes the remand is appealable "if all that remains to do on remand is a purely mechanical, computational, or in short 'ministerial' task, whose performance is unlikely to affect the issue that the disappointed party wants to raise on appeal from the order of remand." In re Fox, 762 F.2d at 55.
 
 
 11
 Consistent with the foregoing principles of finality in bankruptcy we recognize " 'the general rule that an order determining the rights and liabilities of the parties and remanding for an accounting is interlocutory.' " In re County Management, 788 F.2d at 314, quoting In re Goldblatt Bros., Inc., 758 F.2d 1248, 1250 (7th Cir.1985). As with the general rule of finality, however, the quoted rule is subject to exception "where the accounting is merely mechanical and ministerial." Id. at 1250.
 
 
 12
 While the record in the instant case is unclear as to the specific proceedings which will be required on remand, counsel agreed at oral argument that all requests for payment of administrative and legal expenses have already been approved and the disputed receivables have been accounted for and segregated. What remains is merely the bankruptcy court's review of the scheduled expenses to determine which items should be deducted from the accounts receivable, rather than from the other assets. In the posture presented herein, this is no more than a mechanical and ministerial task. Appellate jurisdiction lies.
 
 II. The Effect of the Untimely Reinscription
 
 13
 Lift contends that because ITT failed to reinscribe its assignment of accounts receivable during the life of the initial recordation, the assignment expired, resuscitatable only by an entirely new assignment. Lift's argument turns on a literal reading of the Act. In 1979, La.R.S. 9:3104, providing for filing and recordation of the statement of assignment of accounts receivable under the Act, read in pertinent part:
 
 
 14
 Every such statement shall become effective, in the sense in which the term is used in R.S. 9:3102 from the time of filing; and said filing shall constitute public notice to all persons that assignment of accounts made in accordance with this Part, at any time during the effective period thereof, shall be valid and enforceable as provided herein.
 
 
 15
 Lift would have us hold that under this provision the statement of assignment, and therefore the assignment itself, could have no effect, even between the parties to the contract, except during the period in which the statement of assignment was validly filed of record. This argument confuses the statement of assignment with the actual assignment. The actual assignment may be made in a number of ways, including a separate written act of assignment, a notation on the ledgers of the assignor, or by reprogramming the assignor's computer. The statement of assignment, intended for recordation, is separately provided for in Sec. 3103.
 
 
 16
 In Agrico Chemical Co. v. E.K. Painting, Inc., 432 So.2d 253 (La.1983), the Louisiana Supreme Court faced a similar situation--also involving the 1979 version of the Act--and held that the statement of the assignment, which affects only third parties, need not be filed in order for the assignment to be effective between the contracting parties. Wearing an Erie type robe, we adhere to this teaching by Louisiana's highest court[3] and now hold that the lapse between inscription and reinscription in this case did not affect the validity of the assignment of accounts receivable between Lift and ITT.
 
 III. Validity and Scope of the Assignment
 
 17
 Prior to filing bankruptcy Lift was engaged in the rental of heavy equipment. The district court ruled that the rentals for such equipment were accounts receivable covered by the assignment. Lift challenges that decision.
 
 
 18
 We look first to the assignment itself, which gives ITT a security interest in receivables, defined as "all obligations of every kind at any time owing to us...." Lift argues that this language is not specific enough to effect a valid assignment, relying for this proposition on In re Energy Contractors, 45 B.R. 181 (M.D.La.1984), which held that an assignment of accounts would be valid only if it specifically described the operations whose receivables were assigned, and the place of business applicable to those operations. We recently reversed that ruling, In re Energy Contractors, 791 F.2d 1222 (5th Cir.1986), holding that the Act does not require such specificity. The assignment we held valid in Energy Contractors granted "a security interest in and to all of Borrower's ... existing and future accounts." 791 F.2d at 1224. We find the language used in the instant case legally indistinguishable; it is sufficient to constitute a valid assignment.
 
 
 19
 Lift further maintains that the 1979 statute did not permit an assignment of rents. In 1979, Sec. 3101 defined the receivables subject to assignment under the Act to include "any indebtedness or part thereof due to, arising out of, or acquired in connection with any business, profession, occupation, or undertaking of the assignor...." In 1980, this definition was amended to include proceeds of "the leasing of movable or immovable property."
 
 
 20
 Lift insists that the amendment indicates that the earlier law did not permit assignment of lease payments or rentals. We disagree. The 1979 language encompasses rentals. The items the legislature wanted to exclude from its broad general definition--tort claims, mortgage indebtedness, and indebtedness on promissory notes--were specifically exempted. Had the legislature intended to exclude rentals we are persuaded that it would have done so in like manner.
 
 
 21
 Absent such a legislative statement, and considering the Act's overall purpose of broadening the availability of assignments, Bossier Bank & Trust v. Natchitoches Development Co., Inc., 272 So.2d 731 (La.App.1973), we believe the specific inclusion of rentals in the post-1980 version of the Act was merely a polishing clarification of the earlier definition of accounts receivable. The district court correctly concluded that Lift possessed a valid security interest in the rentals.
 
 IV. The Ryan-Walsh Account
 
 22
 Among the accounts due Lift was $80,000 for the lease of equipment to Ryan-Walsh Stevedoring. Lift borrowed the purchase money for that equipment from Seafirst Commercial Corporation and secured its obligation with an assignment of lease payments.[4] Notwithstanding the assignment, Ryan-Walsh made its payments to Lift and Lift retained them. After the bankruptcy filing, Lift sought to enforce its rights to lease proceeds and the trustee resisted. The parties squared-off but just before trial reached an accord. Their settlement proposal was submitted to the bankruptcy court for approval. Under the agreement, title to the equipment bought with Seafirst funds was transferred to Seafirst and Seafirst was to receive $20,000 of the Ryan-Walsh payments. In return, Seafirst was to release its security position with respect to the remaining $60,000 of Ryan-Walsh payments.
 
 
 23
 Notice of the proposed settlement, including its terms and the nature of the claims involved, was given to all creditors. ITT made no objection. The settlement was approved. ITT now contends that the settlement was violative of its security rights and, in any event, it has a security interest in the remaining $60,000 of Ryan-Walsh payments.
 
 
 24
 The district court rejected that contention. We do likewise. ITT's acquiescence in the settlement agreement permitted the surrender of valuable equipment, equipment which otherwise would have remained in the bankruptcy estate for the benefit of all creditors. Were we to recognize ITT's claimed security interest in the remaining Ryan-Walsh funds, the estate would be depleted of both those funds and the equipment, to the prejudice of unsecured creditors. In reality, the residual funds more closely represent the sale price of the equipment transferred to Seafirst than proceeds of accounts assigned to ITT.
 
 V. Interest
 
 25
 The bankruptcy court concluded that ITT was entitled to interest under Louisiana law at the rate of 12% per annum from the date of judgment. The district court affirmed. Lift argues that this award is erroneous, that interest should be awarded per the interest paid on United States Treasury obligations, as provided by 28 U.S.C. Sec. 1961. We disagree with both propositions.
 
 
 26
 As fully explained in In re Timbers of Inwood Forest Associates, Ltd., 793 F.2d 1380 (5th Cir.1986), panel opinion reinstated, 808 F.2d 363 (5th Cir.1987) (en banc), (petition for cert. pending), interest is not generally available on debts in bankruptcy. As an exception to this rule, a secured creditor may claim interest to the extent that such interest can be satisfied out of applicable security. In the instant case ITT is entitled to interest if sufficient accounts receivable securing its debt remain after payment of the principal.
 
 
 27
 In the case at bar, the assignment of accounts receivable provided that interest on the obligations secured thereby was to accrue at the rate of 10% per annum. Without question that rate applies to the period prior to judgment. While 28 U.S.C. Sec. 1961 provides a standard rate of post-judgment interest, the parties are free to stipulate a different rate, consistent with state usury and other applicable laws. Investment Service Co. v. Allied Equities Corp., 519 F.2d 508 (9th Cir.1975); Mount Airy Refining Co. v. Clark Acquisition, Inc., 470 So.2d 890 (La.App.1985); Bank of New Orleans & Trust Co. v. H.P.B. Jr., 439 So.2d 1269 (La.App.1983). Accordingly, the applicable rate of interest to be applied to ITT's security interest is 10% per annum, and the judgment is so modified.
 
 
 28
 The judgment of the district court, as modified relative to the element of interest, is AFFIRMED.
 
 
 
 *
 See 819 F.2d 546
 
 
 [1]
 The record is silent as to the proper filing fee
 
 
 [2]
 Section 158(d) was adopted in 1984, but is identical to its predecessor. Hence, cases predating its adoption are authoritative as to finality of an order for purposes of appeal. See In re Delta Services Industries, 782 F.2d 1267, 1268 n. 2 (5th Cir.1986), and authorities cited therein
 
 
 [3]
 Accord In re Energy Contractors, 791 F.2d 1222 (5th Cir.1986). Because Agrico Chemical is controlling, we find it unnecessary to elaborate on the support for our holding in the post-1979 amendments to the Act (Act 360 of 1980; Act 319 of 1983), in the Louisiana law of mortgages, Cucullu v. Hernandez, 103 U.S. (13 Otto) 105, 26 L.Ed. 322 (1880); Schutzman v. Dobrowolski, 191 La. 791, 186 So. 338 (1939), and in the Louisiana law regarding sales and other transactions affecting immovable property, La.Civ.Code art. 2442; La.R.S. 9:2721, all of which signify that recordation is required only to make juridical acts effective against third parties
 
 
 [4]
 This assignment, made February 6, 1981, was at first primed by the ITT assignment. When the ITT assignment lapsed, Seafirst's assignment gained a priority which was not lost by the later reinscription